IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT WARGO and ) | |
| PAMELA WARGO, his wife, ) | |
| ) | 2:07-cv-01371 |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| MUNICIPALITY OF MONROEVILLE, ) | |
| PENNSYLVANIA; POLICE CHIEF ) | |
| GEORGE POLNAR, OFFICER KIP E. ) | |
| JOBE, OFFICER STEVEN ) | |
| PASCARELLA, and ASSISTANT POLICE ) | |
| CHIEF K. DOUGLAS COLE, individually, ) | |
| ) | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Presently before the Court is the MOTION FOR SUMMARY JUDGMENT by Defendants Assistant Police Chief K. Douglas Cole, the Municipality of Monroeville, Pennsylvania, Police Chief George Polnar, Officer Kip E. Jobe, and Officer Steven Pascarella (Document No. 27). Plaintiffs filed a Brief in Opposition to Defendants' Motion. (Document No. 34). Both sides filed Concise Statements of Material Fact with numerous exhibits. (Document Nos. 29, 33). The issues have been fully briefed and the matters are ripe for disposition. After careful consideration of the motion, the filings in support and opposition thereto, the relevant case law, and the record as a whole, the Court concludes that the motion for summary judgment will be granted.

**Background**

In resolving a motion for summary judgment, a court must view the facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the

same. The following recitation of facts is thus drafted in the light most favorable to Plaintiffs. The incident which gave rise to this lawsuit occurred on the evening of October 6, 2006. Robert Wargo ("Wargo") arrived home to a notice from Allegheny County stating that his house was under foreclosure and would be sold at a Sheriff's sale. This news was compounded by the fact that Wargo's automotive repair business was financially distressed.

Upon reading the foreclosure notice, Wargo exited his home, carrying with him a cellular phone and a loaded .357 magnum revolver in his jacket pocket. Wargo had a valid PA permit to carry a firearm. Wargo informed his wife Pamela Wargo ("Mrs. Wargo") that he intended to head into the woods in order to think. By his own admission, Wargo was "very upset" and had a variety of "irrational thoughts." Wargo Deposition at 19, 23.

After reaching the woods behind his home, Wargo sent a text message to his wife that stated: "If I would kill myself you can file a wrongful death suit against the Muller's…[Do] not fight what's coming because every end has a new beginning."[1] Wargo Deposition at 26. Wargo then left his phone behind on a bench and continued further into the woods. After receiving this message from her husband, Mrs. Wargo contacted her parents, who in turn came to the Wargo residence and called the police.

Corporal Kip Jobe ("Jobe") of the Monroeville Police Department received a dispatch on his radio concerning a potentially suicidal individual with a firearm. As shift supervisor at the time, Jobe responded to the call, and was told by Assistant Police Chief Kenneth Cole ("Cole") to contact him if necessary. Cole ultimately had no personal involvement in taking Wargo into custody, and arrived at the Wargo residence only at the

---

[1] Wane Muller and his son Wane, Jr. had previously worked for Wargo at his auto repair business, and brought a wrongful termination suit against Wargo upon their dismissal. The Wargos blamed Mullers for their financial misfortunes.

2

end of the ordeal in question. While traveling to the scene, Jobe contacted Lieutenant Steven Pascarella ("Pascarella"). Jobe set up a staging area approximately a quarter mile away from Wargo's home where additional officers could coordinate their activities. Several officers began to search for Wargo in the area around his home. Jobe proceeded to Plaintiffs' residence.

After his arrival at the Wargo residence, Jobe spoke to Mrs. Wargo, who led Jobe to a bench at the top of the Wargo's back yard where she thought her husband might be. It is disputed as to whether Jobe learned of Wargo's suicidal thoughts from Mrs. Wargo or from reading the text message. Nevertheless, Jobe was aware of Wargo's mental state before the two men encountered one another. It is also disputed exactly when Jobe learned that Wargo was carrying a .357 magnum, but it is undisputed that Jobe knew about the gun before he encountered Wargo.

Wargo returned from the woods back towards his home; he was aware of the police officers surrounding the vicinity after having overheard a passing search party. Upon seeing Wargo, Jobe shined his flashlight and identified himself. With his own gun drawn, Jobe instructed Wargo to take his hands out of his pockets and lie on the ground. It is undisputed that Jobe could clearly see a gun in Wargo's jacket pocket. Wargo was belligerent, and responded by telling Jobe to "get the f--king [flash]light out of my face" and leave his property. Wargo Deposition at 33-34; Jobe Deposition at 56. Wargo calmed to a degree, but still refused to comply with Jobe's repeated commands to stop and disarm. Specifically, Wargo stated that he had done nothing wrong and "can't just pull my hands out of my pocket . . . my gun's on me, it will drop to the ground, it will discharge off the pavement." Wargo Deposition at 33.

As Wargo continued to approach Jobe, the officer repeated his commands for Wargo to take his hands out of his pocket and drop the weapon. Wargo refused to comply, and again offered the excuse that he could not disarm because dropping the gun would cause it to misfire. Wargo's hands were in his jacket pocket, cradling gun; its butt was resting on Wargo's arm, with the cylinder but not the barrel protruding. Jobe was "absolutely" afraid of Wargo as the latter's approach continued, Exhibit 2 at 14, and Jobe was ultimately forced to retreat from his original position.[2]

When the two individuals were approximately 15 feet apart, Wargo momentarily glanced away from Jobe, who holstered his firearm and transitioned to his taser. Immediately thereafter, Jobe discharged the taser into Wargo's body, which was designed to release an output of 50,000 volts. The barbs of the taser struck Wargo below the throat and in his chest, although Defendants contend that one barb merely made contact with his coat. Despite having been hit by the taser, Wargo remained standing, and alleges that his body tensed up and he could not move. He was able to verbally respond that he could not comply with Jobe's instructions to lie down.

With Wargo still standing and failing to obey commands to lie down, Jobe again discharged his taser. Jobe's taser log shows that he cycled his taser—pulling the trigger and releasing an electrical discharge—a total of five times over a period of 32 seconds. Following the last taser discharge, Officer Pascarella arrived on the scene. Pascarella had overheard on his radio the previous contentious exchange between Jobe and Wargo.

---

[2] Plaintiffs argue that Jobe never felt threatened by Wargo. This assertion is not supported by the record evidence, but instead, is based on a misleading citation to Exhibit 2, page 16, which contained an answer to a question that was not in the context of Jobe's emotional state as Wargo continued his armed approach. When asked whether he was afraid of Wargo at the relevant time in question, Jobe's answer was unequivocally in the affirmative.

Pascarella also believed that Wargo was armed. Observing Wargo still standing, Pascarella fired his taser into Wargo's back after holstering his previously drawn handgun.

Wargo fell to the ground after Pascarella's taser discharge. At that point, Pascarella, with his boot on Wargo's wrist, instructed Wargo to turn over, lie on his stomach, and put his hands at his sides. Wargo did not comply, responding "f--k you." Pascarella Deposition at 58. Thereafter, Pascarella again discharged his taser. Wargo was then handcuffed and allowed to stand up. Mrs. Wargo was present at this point, having heard the sounds of the tasers. It is disputed, however, as to how much of the incident Mrs. Wargo witnessed, though she testified to seeing officers around her husband, and pushing them away because she believed he could not adequately breathe.

Plaintiffs allege that, after the initial use of the taser of Wargo, another (unidentified) officer on the scene recovered the .357 magnum from the ground after it fell from Wargo's pocket, and announced this fact to Jobe.[3] There is no evidence in the record to support this contention independent of Wargo's testimony, and that testimony does not establish the specific point in time at which the gun was retrieved. Wargo Deposition at 41. Jobe testified that Wargo was still armed after his first taser discharge, and both he and Pascarella aver that it was Pascarella who retrieved Wargo's firearm, which occurred after Pascarella first fired his taser. Jobe Deposition at 76; Pascarella Deposition at 58-60, 65.

Wargo required no medical attention at the scene. He was taken to Forbes Regional Hospital, where he was involuntarily committed to the Psychiatric Unit and observed for

---

[3] Plaintiffs also aver that a third officer on the scene discharged his or her taser, who was perhaps the same unidentified individual. Wargo Deposition at 42. Wargo did not testify as to who this person might be. Most importantly, all evidence in the record, both the testimony of the individual Defendants and the electronic discharge records from the tasers themselves, establishes that only Jobe and Pascarella made use of their tasers.

several days. Aside from minor puncture wounds from the barbs of the taser, Wargo required no additional medical treatment from hospital staff. George Polnar ("Polnar") served as Monroeville Chief of Police during this incident, but was not directly involved with any of the officers' actions on the night of their encounter with Wargo. Ultimately, after having initially been charged with resisting arrest, Wargo pled guilty to one count of summary disorderly conduct and forfeited his gun ownership.

**Discussion**

I.  <u>Plaintiffs' Complaint and the Standard of Review for Defendant's Motion for Summary Judgment</u>

Plaintiffs filed a seven-count complaint against multiple defendants. Count I, against the Municipality of Monroeville, alleges deprivation by its agents of constitutional rights within the meaning of 42 U.S.C. § 1983. Counts II through V are filed individually against Defendants Polnar, Jobe, Pascarella, and Cole for violation of civil rights under the Fourth and Fourteenth Amendments to the U.S. Constitution while acting under the color of law, again pursuant to § 1983. Count VI against the Municipality of Monroeville alleges tort claims of assault and battery under Pennsylvania law. Lastly, Court VII of the complaint, brought by Mrs. Wargo only, alleges intentional infliction of emotional distress.[4]

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed

---

[4] Plaintiffs filed an amended complaint on March 5, 2008, apparently in order to correct Pascarella's first name, which was stated as "Keith" in the initial filing. No other substantive changes to the complaint appear to exist. Plaintiffs acknowledge that excessive use of force claims are properly analyzed only under the Fourth Amendment.

issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

II.     Excessive Use of Force by Defendants Jobe and Pascarella

Section 1983, 42 U.S.C. § 1983, does not create substantive rights, but rather provides a remedy for the violation of rights created by federal law. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). A *prima facie* case under § 1983 requires a plaintiff to demonstrate: (1) that the alleged wrongful conduct was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). In the instant case, Plaintiffs assert excessive use of force claims against Defendants Jobe and Pascarella based on their multiple tasings of Wargo.

A claim that a law enforcement officer has used excessive force in the course of an arrest, investigatory stop, or other seizure is to be analyzed under the standard of reasonableness proscribed by the Fourth Amendment to the U.S. Constitution. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Determining whether the force used to effectuate an

arrest is "reasonable" requires balancing '"the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (*quoting United States v. Place*, 462 U.S. 696, 703 (1983)).

In considering the reasonableness of a law enforcement officer's use of force, courts are to contemplate the specific facts and circumstances of the case, which include the severity of the underlying offense, the threat to the safety of the officers or others posed by the suspect in question, and whether that suspect is actively resisting arrest. *Id.* at 396; *see also Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004). Any reasonableness determination conducted by the Court is to occur from the perspective of a reasonable officer at the scene, and without the benefit of hindsight. *Graham*, 490 U.S. at 396. Additionally, determinations of whether a police officer's actions are reasonable must take into account that split-second decisions are required by law enforcement personnel in circumstances that are "tense, uncertain, and rapidly evolving." *Id.* at 397. These considerations are particularly acute in this case, in which Defendants were confronting an armed, suicidal, and belligerent man. The Court will address the reasonableness of Defendants' actions at three stages of the incident, as contested by Plaintiffs.

   A.  Initial Taser Discharge by Defendant Jobe

No reasonable jury could conclude that the initial use of the taser on Wargo by Jobe constituted an excessive use of force. After encountering one another, Wargo was instructed by Jobe to stop his approach and to drop his gun. Wargo responded by telling the officer to "get the f--king [flash]light out of my face," and demanded that Jobe leave his property. Wargo Deposition at 33-34; Jobe Deposition at 56. As viewed in a light most favorable to Plaintiffs, Wargo eventually became less belligerent, but still refused to stop moving toward

8

Jobe. Most importantly, Wargo never complied with Jobe's continued instructions to remove his hands from his pockets and disarm, and in fact, Wargo had his hand placed on the gun.

It is undisputed that Wargo possessed a deadly weapon and refused to obey instructions to stop moving and drop his firearm. Thus, it was objectively reasonable for Jobe to attempt to subdue Wargo with his taser so that the firearm could be removed from him. *See e.g. McConnell v. McKillip*, 573 F. Supp. 2d 1090 (S.D. Ind. 2008) (granting summary judgment for police when they used a taser to effectuate an arrest of a plaintiff armed with a wooden board).

Indeed, Wargo's decision to ignore instructions to disarm, his erratic emotional state and previous suicidal threats, and his continued advance towards Jobe would have justified the officer's use of ***deadly*** force for his protection. Under Pennsylvania law, a police officer is justified in using deadly force when there is a belief that such force is necessary to prevent death or serious bodily injury to himself or others. 18 Pa. C.S. § 508 (2008); *See Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004) (holding it objectively reasonable to use deadly force to stop an advancing, erratic, and previously-armed suspect); *Bloxson v. Borough of Wilkinsburg*, 110 Fed. Appx. 279, 283 (3d Cir. 2004) (affirming summary judgment for police who shot and killed an individual stopped for a vehicle registration violation when he ignored commands not to pick up a firearm that fell from his knapsack). Fortunately for Wargo, Jobe instead chose to use the lesser force of the taser. No reasonable jury could conclude that the use of non-lethal force was excessive in this situation in which deadly force would have been justified.

B.     Continued Use of Taser by Defendant Jobe After Initial Discharge

No reasonable jury could conclude that Jobe's continued use of the taser after the initial discharge was unreasonable. Wargo argues that, after the initial use of the taser, his entire body tensed up and he could not move. Thus, continued taser discharges were unnecessary even if he still did not obey Jobe's commands. Methods employed by law enforcement that may seem extreme with the benefit of hindsight are not *per se* constitutional violations, even if they caused discomfort to a plaintiff. *See Graham,* 490 U.S. at 396; *Sharrar v. Felsing*, 128 F.3d 810, 821 (3d Cir. 1997). The reasonableness of law enforcement conduct is a question for the jury in some instances, but this is not such a case. As always, the events at issue must be viewed through the eyes of a reasonable officer at the scene. *Graham,* 490 U.S. at 396.

1.     Viewed through the eyes of a reasonable officer at the scene, Defendant Jobe was confronted with an armed, non-compliant suspect, and thus it was reasonable to continue to use non-lethal force

Jobe's objective in using the taser was to cause Wargo to fall to the ground so that officers could gain control over him and recover the gun. The initial cycle of Jobe's taser was not effective in this regard, and Jobe believed that Wargo was still armed with the .357 magnum. Jobe issued further instructions to get on the ground, to which Wargo was able to verbally respond, but with which he did not comply. Thus, Jobe made the decision to discharge his taser a second time so that the previously combative, still verbally responsive, and apparently non-complaint Wargo might be safely subdued.

When the second use of the taser was similarly ineffective, Jobe fired it several more times, until such time as Pascarella arrived on the scene, determined that it was necessary to fire his taser as well, and finally restrained Wargo. Jobe's confrontation occurred within 32

10

seconds. Such conduct does not constitute excessive force. *See e.g. Moore v. Vangelo*, 222 Fed.Appx. 167, 171 (3d Cir. 2007) (affirming grant of summary judgment for law enforcement when initial use of non-lethal force—a police dog—was ineffective in bringing a plaintiff to the ground and, thereafter, an officer grabbed and swept-kicked the suspect into submission).

Plaintiffs argue, based upon a Monroeville Police Department training video, that Jobe should have known that Wargo was sufficiently incapacitated by the first taser discharge even though he did not fall to the ground. The video in question is predicated upon a scenario to which no reasonable jury could draw an analogy. The subject in the training video is a suicidal man who was neither non-compliant nor brandished a weapon, quite unlike Wargo. In addition, there are a number of police officers on the scene in the video that had the ability to collectively subdue the individual in question once stunned. In the case at hand, however, Jobe was not in a position to receive assistance from any other officer at the time he continued to use the taser on Wargo. Thus, in light of the fact that Wargo was armed, still standing upright, and able to speak, it was objectively reasonable for Jobe to continue to discharge his taser in order to disarm Wargo.

Moreover, the degree of force used by a police officer to subdue a previously armed individual is not deemed excessive if it was reasonable for the officer to believe that the suspect still possessed a weapon. *Untalan v. City of Lorain*, 430 F.3d 312 (6th Cir. 2005); *see also Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998). In *Untalan*, a mentally-disturbed suspect threatened and attacked police with a butcher knife while in the home of his mother. 430 F.3d at 313. At some point, the plaintiff lost control over the weapon that he was previously holding, but nevertheless, an officer fatally shot him. *Id.* at

314. In affirming the District Court's grant of summary judgment in favor of the police, the Court of Appeals stated that an officer reasonably could have fired the fatal shot under the ultimately incorrect impression that the suspect was still armed. *Id.* at 315.

While this case does not involve the use of deadly force as in *Untalan*, the rule of law and its application apply with even greater vigor, because Wargo was armed with a gun, not a knife, and was subdued with a taser rather than lethal force. This case is one in which **non-lethal** force was used to combat a belligerent, suicidal man **armed with a gun**. Record testimony from Jobe reflects that he believed Wargo was still armed as he engaged in further discharges of his taser. Jobe Deposition at 78, 81. Pascarella's statement that Wargo was still in possession of the gun when he arrived on the scene substantiates this testimony. Pascarella Deposition at 58-59. Jobe's belief was certainly reasonable given the fast-moving nature of the situation—less than one minute—and the resulting difficulty for Jobe to realize that Wargo's gun may have fallen to the ground. As noted, Wargo was never compliant with Jobe's repeated requests to stop his approach, disarm, and lie down on the ground. Consequently, a reasonable jury could not conclude that Jobe's use of force was unreasonable.

> 2.   Even if Wargo had, indeed, dropped the gun as he alleges, the force employed by Defendant Jobe was still reasonable.

Plaintiffs contend that Wargo's gun fell from his pocket onto the ground after the initial use of the taser by Jobe. Even in the context of summary judgment, it is Plaintiffs' burden to bring forth "more than a scintilla" of evidence to support this contention, *Williams*, 891 F.2d at 460. Plaintiffs' merely offer the testimony of Wargo to substantiate their allegation, which, as previously discussed by the Court, is unsupported by the weight of the record evidence.

However, even assuming, *arguendo*, that Wargo was disarmed after the first cycle of Jobe's taser, a reasonable jury must still conclude that continued use of the taser was not excessive. Even if a plaintiff is not armed, it is reasonable for law enforcement to employ multiple rounds of non-lethal force if necessary to effectuate an arrest. *See Mierzwa v. United States*, 282 Fed.Appx. 973, 979 (3d Cir. 2008) (holding that when the physical force of officers was insufficient to subdue an unarmed arrestee, it was objectively reasonable to subsequently employ pepper spray); *Armbruster v. Marguccio*, 2006 WL 3488969, *6 (W.D. Pa. 2006) (granting summary judgment for police when they continuously used a taser on an unarmed, ***involuntarily*** non-compliant suspect, who kept moving only because he was suffering from physical spasms beyond his control).[5]

In this case, due to Wargo's combative nature, prior refusal to disarm, and suicidal state, combined with the previous ineffectiveness of Jobe's taser, it was objectively reasonable for Jobe to conclude that Wargo still posed a threat and thus further action on his part was necessary in order to subdue the suspect, armed or not.[6] Once Jobe had already deployed his taser, it was the most logical course of action to continue to use it, as opposed to utilizing another form of non-lethal force. In light of these factors, a jury would not categorize Jobe's use of force as excessive based upon the applicable standards of reasonableness.

---

[5] Summary judgment was not granted for the initial taser discharge in *Armbruster*, as the plaintiff had yet to display any characteristics of non-compliance. That aspect of *Armbruster* is clearly distinguished from the case currently before the Court, as Wargo was non-compliant and belligerent from the onset of the incident.

[6] Again, the Court notes that the record evidence does not support Plaintiffs' argument that Jobe never felt threatened by Wargo.

13

### C. Final Taser Discharges by Defendant Pascarella

Concerning the final two uses of a taser on Wargo by Pascarella, a reasonable jury must conclude that his actions did not constitute excessive force. Upon arriving at the scene, Pascarella reasonably believed that he was confronted with an armed, previously belligerent suspect who had yet to be subdued. Even if Wargo was no longer in possession of his firearm once Pascarella encountered him, a proposition not supported by record evidence, there is no question that Pascarella reasonably believed that Wargo was still armed, as illustrated by his deposition testimony. Pascarella Deposition at 58-59. Such a belief was reasonable under the circumstances. *See Untalan*, 430 F.3d 312, 315.

Believing himself to be confronted with an armed suspect who had yet to be subdued, Pascarella drew his firearm, but then transitioned to his taser. Force reasonably necessary to effectuate an arrest does not represent an inherent Constitutional violation. *See Carswell,* 381 F.3d at 240. It was thus reasonable for Pascarella to have discharged his taser. *See e.g. McMillian v. Gem County, Idaho,* 2008 WL 5069094, slip op. (D. Idaho. November 25, 2008) (granting summary judgment for police who use a taser an unarmed individual who repeatedly ignored officers' requests to stop walking towards his house and to place his arms behind his back).

Similarly, it would not be deemed unreasonable for Pascarella to have used his taser a second time when Wargo mounted his last act of resistance by refusing to assume a position that allowed for his arrest. *See e.g. Brown v. Rinehart*, 2009 WL 1154244, slip op. (3d Cir. April 30, 2009) (affirming district court grant of summary judgment when police employed a "stun blow" to suspect's head after initial pepper spray in the eyes did not allow officers to gain control over him); *Stanley v. City of Baytown, Texas*, 2005 WL 2757370

(S.D. Tex. 2005) (holding Defendant's use of taser objectively reasonable when Plaintiff continually thrashed and refused to obey orders, even though Plaintiff was partially-restrained on a stretcher and about to be loaded into a ambulance).

The Court notes that Defendants' actions did not result in any outward physical harm to Wargo, save for minor puncture wounds from the taser barbs. While our appellate court has not held that the absence of physical injury necessarily signifies that force has not been excessive, it is "a relevant factor to be considered as part of the totality." *Sharrar,* 128 F.3d at 823. The record establishes that the medical professionals at Forbes Regional Hospital diagnosed Wargo with no lingering effects from Defendants' use of their tasers. Wargo's claims to the contrary are not substantiated by medical evidence.

        D.      Conclusions as to Defendants Jobe and Pascarella's Use of Force

In sum, no reasonable jury could conclude that the use by Jobe and Pascarella of their tasers on Wargo constituted an excessive use of force. The Court recognizes that, in some circumstances, the use of a taser by law enforcement could be excessive. This is not such a case. Jobe was confronted with an armed, belligerent man who refused to comply with orders to stop his approach, drop his gun, and lie down on the ground, and thus reasonably employed his taser to subdue the suspect. Because Wargo still had not complied with Jobe's orders and posed a potential threat if not restrained, Jobe's continued discharges of his taser were likewise reasonable. This would be true regardless of whether Wargo was in direct possession of his firearm. Finally, because all previous attempts to control Wargo were unsuccessful, and given Pascarella's reasonable belief that Wargo was still armed, a reasonable jury could not conclude that his use of taser force was excessive.

III.  <u>Defendants' Entitlement to Qualified Immunity</u>

Notwithstanding the foregoing conclusions, if one assumed, *arguendo*, that Defendants' conduct did indeed constitute a § 1983 violation, they would still be afforded qualified immunity for their actions. Qualified immunity will be granted when a reasonable officer in the position of a defendant could have believed that his or her conduct was lawful in light of the established law and information known to the officer at the time of the incident. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Such is the case with the Defendants presently before the Court. *See Russo v. City of Cincinnati,* 953 F.2d 1036, 1045 (6th Cir. 1992). The Court in *Russo* granted qualified immunity to law enforcement for continued use of a taser after its initial ineffectiveness, even though the suspect no longer posed an immediate threat to police on the scene, and held that said conduct did not constitute excessive force *Id.* Accordingly, at the point where a constitutional violation had occurred, qualified immunity would be granted to Defendants.

Plaintiffs direct the Court's attention to *Buchanan v. West Whiteland Township* in support of their argument that Defendants should not be granted qualified immunity. 2009 U.S. Dist. Lexis 6653 (E.D. Pa. 2009). The qualified immunity analysis always starts with a finding of whether the facts in question make out a constitutional violation. *Saucier v. Katz*, 533 U.S. 194 (2001). In *Buchanan*, the court declined to grant summary judgment on the basis of qualified immunity because factual issues precluded reaching this initial determination, and not because the existing law placed the officers in question on notice that their conduct violated the plaintiff's fundamental rights. *Id.* at *20. Additionally, the plaintiff in *Buchana*n was unarmed, and would thus not pose the same immediate threat as Wargo. *Id.* at *2-4. Thus, *Buchanan* does not stand for the proposition that law enforcement

officers in this jurisdiction are charged with the knowledge that repeated use of a taser to subdue a suspect similarly situated to Wargo constitutes unlawful conduct.

IV.   <u>Plaintiffs' Remaining Claims Against Defendants Cole, Polnar, and the Municipality</u>

Plaintiffs concede that they have failed to bring forth any evidence to substantiate a claim by Mrs. Wargo for intentional infliction of emotional distress. Furthermore, because no reasonable jury could find that the actions of Jobe or Pascarella constituted an excessive use of force, a similar conclusion must follow with regard to Plaintiffs' derivative § 1983 claims against Defendants Cole, Polnar, and the Municipality of Monroeville, which are premised on the failure to adequately supervise and/or train Jobe and Pascarella.

In order to establish individual liability in a § 1983 action, Plaintiffs' are required to show that Cole and Polnar "participated in violating their rights . . . directed others to violate them, or that [they], as the person[s] in charge . . . had knowledge of and acquiesced in [their] subordinates' violations." *Baker v. Monroe Township,* 50 F.3d 1186, 1190-91 (3d Cir. 1995). Because there was no underlying constitutional violation, there was no improper action in which Cole and Polnar could acquiesce. Moreover, even if Jobe and Pascarella had employed excessive force, there is no evidence in the record to conclude that Cole and Polnar participated in Wargo's apprehension, nor did they have actual knowledge of or acquiesce in the acts undertaken by Jobe and Pascarella in order to subdue Wargo.

As to the Municipality of Monroeville, a § 1983 claim cannot exist predicated solely on the basis of vicarious liability. *Carswell*, 381 F.3d at 244. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dept. of Soc. Servs., New York City*, 436

U.S. 658, 694 (1978). Wargo's rights under the Fourth Amendment were not violated, and therefore, no *Monell* claim against Monroeville exists.

The state tort claims of assault and battery against Monroeville also fail. In order for a Pennsylvania municipality to be liable for tort claims, the offending conduct of its employees must be willful in nature. 42 Pa. C.S. § 8550 (2008). Thus, Plaintiffs must demonstrate that the officers deliberately assaulted and battered Plaintiffs. Law enforcement officers may be liable for assault and battery in Pennsylvania if the force used to effectuate an arrest is excessive. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293-94. As the U.S. Supreme Court has stated, all excessive force determinations concerning law enforcement are governed by the standards of reasonability under the Fourth Amendment. *Graham*, 490 U.S. at 395. Because no reasonable jury could conclude that the force used by Defendants was excessive, no underlying tort claims of assault and battery against Defendants individually would lie. As a result, such tort claims against the Municipality cannot proceed.

Concerning Plaintiffs' equal protection claims, no reasonable jury could conclude that Plaintiffs' Fourteenth Amendment rights had been violated. To bring a viable equal protection claim, a plaintiff must allege that a defendant treated him or her differently than others similarly situated, and that such selective treatment was predicated upon membership in a suspect class (e.g. race, gender) or designed to inhibit fundamental rights. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440 (1985). Dissimilar conduct under the law may be excused if it is rationally related to a legitimate state interest. *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981). In the instant case, Plaintiffs fail to bring forth any evidence that Defendants acted because of Plaintiffs' race, gender, or similar classification. Additionally, there is no evidence that Defendants' actions were designed to inhibit

Plaintiffs' Second Amendment right to bear arms, as Plaintiffs allege. Instead, all evidence indicates that Defendants acted merely to subdue an unruly and potentially dangerous suspect. Therefore, Plaintiffs fail to fulfill any element of an equal protection claim.

**Conclusion**

In summary, when viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could not conclude that the actions of Jobe and Pascarella violated Wargo's constitutional right to be free from unreasonable seizure by using excessive force. For similar reasons, Plaintiffs' claims against Cole, Polnar, and the Municipality of Monroeville cannot survive. Plaintiffs also fail to bring forth any facts to substantiate claims concerning equal protection under the law or intentional infliction of emotional distress. Therefore, Defendants' motion for summary judgment will be granted.

An appropriate order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |  |
|---|---|---|
| **ROBERT WARGO and** | ) | |
| **PAMELA WARGO, his wife,** | ) | |
| | ) | **2:07-cv-01371** |
| **Plaintiffs,** | ) | |
| v. | ) | |
| | ) | |
| **MUNICIPALITY OF MONROEVILLE,** | ) | |
| **PENNSYLVANIA; POLICE CHIEF** | ) | |
| **GEORGE POLNER, OFFICER KIP E.** | ) | |
| **JOBE, OFFICER STEVEN** | ) | |
| **PASCARELLA, and ASSISTANT POLICE** | ) | |
| **CHIEF K. DOUGLAS COLE, individually** | ) | |
| | ) | |
| **Defendants.** | | |

## ORDER OF THE COURT

AND NOW, this 27th day of July, 2009, in accordance with the foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED, AND DECREED** that the MOTION FOR SUMMARY JUDGMENT by Assistant Police Chief K. Douglas Cole, Municipality of Monroeville, Pennsylvania, Police Chief George Polnar, Officer Kip E. Jobe, and Officer Steven Pascarella (Document No. 27) is **GRANTED.** The Clerk will docket this case as closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:   John Linkosky, Esquire
      Email: linklaw@comcast.net

      Paul D. Krepps, Esquire
      Email: pdkrepps@mdwcg.com